## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

KERRIN A. BARRETT )
5753 Highway 85 North )
Crestview, FL 32536, )
)
Plaintiff. )
)
v. )
)
PAE Incorporated )
7799 Leesburg Pike, Suite 300 North )
Falls Church, VA 22043-2408 )
)
Serve On: )
PAE Incorporated )
7799 Leesburg Pike, Suite 300 North )
Falls Church, VA 22043-2408 )
1-888-526-5416, )
)
Defendants. )
)

FILED
MAILROOM

JAN 2 9 2021

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

Civil Action No.  1:21 CV 107

**JURY TRIAL DEMAND**

## COMPLAINT AND JURY DEMAND
## FOR DAMAGES UNDER 31 U.S.C. § 3730(h)

Kerrin A. Barrett ("Dr. Barrett") brings this action *pro se* against the above-named Defendant,

PAE Incorporated ("PAE"), for illegal conduct and retaliation against her under 31 U.S.C. §

3730(h) and Virginia law.

### Introduction

In support of the instant action, Plaintiff states the following:

1.   This is an action to recover damages and civil penalties arising from Defendant's illegal

retaliation toward Plaintiff as a result of her activities in furtherance of the False Claims Act

("FCA").

2.   Dr. Barrett alleges that Defendants retaliated against her for making disclosures protected by the FCA related to the wrongful and fraudulent misappropriation of public funds and violations of contracts with the United States Department of State ("DOS") by PAE staff, and for Dr. Barrett reporting Defendant's misconduct.

3.   As a result of Defendant's activities, Plaintiff has suffered grievous financial and emotional harm and is entitled to all damages available to her under the False Claims Act, 31 U.S.C. § 3730(h) ("FCA") and Virginia law.

## Jurisdiction and Venue

4.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 because this action arises under the laws of the United States, namely the FCA.

5.   This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a).

6.   This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732 because PAE transacts business in this judicial district. PAE has its publicly listed offices in Falls Church, Virginia. Defendants have substantial contacts with and conducts business in the Commonwealth of Virginia.

7.   PAE is subject to the personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1(A)(1), (2), (3), and/or (4).

8.   It is also a judicial district where a substantial part of the events or omissions giving rise to the claims occurred, because Dr. Barrett was operating out of PAE's office in Arlington when they retaliated against Dr. Barrett.

## Parties

9.   Dr. Barrett was a resident of Falls Church, Virginia, during her employment with PAE and worked in PAE's Arlington, Virginia office.  She was the Senior Monitoring and Evaluation

Advisor who oversaw the program data gathering and reporting for PAE's U.S. State Department Corrections System Support Program ("CSSP") in Kabul, Afghanistan.

10. PAE is a for-profit corporation in good standing in the Commonwealth of Virginia and maintains its principal office in Falls Church in the Commonwealth of Virginia.

11. PAE has numerous United States government contracts to provide an array of goods and services. Among these goods and services is the provision of support services to U.S. government entities both domestically and internationally at forward operating areas.

## Background and Factual Allegations

### About Dr. Barrett's Employment

12. Dr. Barrett was first employed by PAE in 2012 in the same position as a contractor in Kabul, Afghanistan, on a sister project, the Justice System Support Program (JSSP).

13. Dr. Barrett worked as a contractor for PAE from 2012 until 2013 as a Senior Monitoring and Evaluation ("M&E") Advisor for the Justice Sector Support Program ("JSSP") – U.S. Department of State in Kabul, Afghanistan. Dr. Barrett was responsible for all of the JSSP program performance data, which included the rule of law training and mentoring programming. In response to concerns from Congress, specifically Senator John McCain, and from Secretary of State Hillary Clinton, expressed to INL about the effectiveness of their program, Dr. Barrett conceptualized and executed a qualitative study on programmatic outcomes for 7 years of project implementation totaling $500 million. Dr. Barrett grew the M&E team from one to 22, including M&E capacity building for 18 national staff. She led the design of the JSSP M&E database to improve data quality and reporting.

14. Dr. Barrett worked as a contractor for PAE doing proposal writing for the U.S. Department of State's Honduras Justice Sector Support Program from November to December

2015. Dr. Barrett provided technical input on monitoring and evaluation, and liaised with high-level US international law enforcement Subject Matter Experts to develop the proposal.

15.  During the times relevant herein, Dr. Barrett was an employee of PAE in the position of Senior Monitoring and Evaluation Advisor in the Corrections System Support Program ("CSSP"), Afghanistan, working for the U.S. Department of State. CSSP is funded by the US State Department's Bureau of International Narcotics and Law Enforcement Affairs ("INL"). Dr. Barrett was in charge of CSSP program performance data and reporting to the Department of State. Dr. Barrett was responsible for gathering and reporting on prison data, which included women and children incarcerated in the prisons, high value targets, and members of ISIS, the terrorist group in the Middle East.

16.  Specifically, Dr. Barrett's duties primarily included responsibility for gathering data and writing required reports under the State Department/INL's Performance Measurement Plan (PMP) for the training and mentoring tasks under the Statement of Work.  Additionally, her duties also included reviewing other tasks under CSSP, e.g., donations and construction, to determine outputs and outcomes of those activities.

17. In early 2017, Dr. Barrett was given an outstanding performance review with a commensurate raise in annual salary.

18. Dr. Barrett faithfully helped PAE carry out its obligations to provide the United States government with top tier support and services.

19. In the course of her work at PAE, Dr. Barrett observed both shocking misconduct and egregiously low standards both in Arlington and in Kabul.

4

20. Dr. Barrett reported the fraudulent data and reporting to PAE management and to INL CSSP Program Officers on multiple occasions, in regular meetings, and in formal communications, including email and regular and ad hoc reporting.

Among other things, PAE engaged in the following illegal acts:

21.  Since the inception of the INL Corrections Support System Program ("CSSP"), and in particular since 2012, when INL instituted the PMP, PAE engaged in fraudulent data reporting of programmatic data under the INL CSSP contract.  PAE consistently over-represented the actual number of Afghans being trained and mentored under CSSP, claiming at least three times the actual number of trainees and mentees than were actually trained and mentored.  The M&E team was reporting approximately 4,000 corrections personnel trained and mentored, while the Kabul Chief of Team ("CoT"), Jesse Williams ("Mr. Williams"), was sending a "FACT sheet" with a number three times as large, over 12,000, directly to INL.

22.  PAE also submitted or caused to be submitted false claims for construction projects completed, which were either incomplete or poor quality construction not in keeping with INL standards since the inception of CSSP, and in particular since 2012.

23.  PAE also submitted or caused to be submitted false claims for donations to Afghanistan government prisons since the inception of CSSP, and in particular since 2012.  Donations were never verified as reaching the intended populations in Afghanistan's prisons, with evidence presented in conversations and emails with American and Afghan CSSP advisors that donations were not ending up in the hands of the intended recipients, e.g., they were ending up as gifts and in Prison Commander's homes, if they ever reached the prisons at all.

24. PAE also submitted or caused to be submitted false claims for Industries programs that either did not exist at all in the prisons or had far fewer trainees than was being reported since the inception of CSSP, and in particular since 2016.

25. The falsified data was used to: 1) show evidence of programmatic outcomes when invoices were submitted to INL for payment; 2) obtain new contracts with INL on CSSP contracts; and 3) obtain Congressional funding for other Defense Department and State Department contracts.

26. PAE was awarded a new contract for CSSP in May 2017. Despite deep budget cuts and staff layoffs in other departments, Dr. Barrett requested and received a 100% increase in her local national staffing from the INL CSSP Program Officer.

27. Dr. Barrett initiated a series of M&E performance improvements on or about the time of the new contract award that included significantly enhanced data verification, prison staff capacity building in monitoring and evaluation, remote data entry from Advisors based on-site in prisons, and client real-time data access.

28. All events took place either in Virginia at PAE's corporate headquarters in Arlington or in its Kabul office in Afghanistan.

## **PAE's Illegal Activities**

29. The allegations discussed herein derive from PAE's attempts to illegally threaten, harass, and intimidate Dr. Barrett in violation of 31U.S.C. § 3730(h).

**PAE Fraudulently Reported CSSP Programmatic Outcomes in Violation of its Contractual Obligations**

30. Starting in mid-2016 and continuing up through Dr. Barrett's wrongful termination on January 31, 2018, PAE knew, or reasonably could be expected to have known, that Dr. Barrett

objected to PAE's fraudulent data reporting and was acting in furtherance of the False Claims Act.

31.  On numerous occasions starting in 2016, Dr. Barrett made clear to senior PAE management that PAE's falsified reporting was illegal and misrepresented the actual outcomes of the CSSP program in Afghanistan. Dr. Barrett repeatedly requested that PAE upgrade its data gathering processes and procedures, to include building technical capacity in PAE's local national staff and the Afghanistan government prison staff.

32.  PAE, not wishing to place its lucrative revenue stream from the CSSP contract in jeopardy, refused to change its conduct. Instead, PAE's Kabul Chief of Team ("CoT"), Jesse Williams ("Mr. Williams"), in complicity with PAE's Arlington office management, continued to report falsified training and mentoring numbers in the "FACT Sheets" sent regularly to the U.S. State Department's CSSP Program Office, in direct contradiction to the numbers being reported from Dr. Barrett's staff in the field and analyzed by herself and Quantitative Data Analyst Nick Zyzneiuski in PAE's headquarters in Arlington, Virginia.

33.  In June 2016, Mr. Lietzau began leading the division in which Dr. Barrett was an employee. As such, he was responsible for overseeing the entire CSSP program.

34.  Richard Greene ("Mr. Greene") served as PAE's President of Global Logistics and Stability Operation (GLSO).  Mr. Lietzau and Alison Eastridge ("Ms. Eastridge") reported directly to Mr. Greene.

35.  Throughout the latter half of 2016 and up to January 31, 2018, PAE further harassed and intimidated Dr. Barrett by making misleading and vexatious statements and representations regarding Dr. Barrett's attempts to establish standard monitoring and evaluation processes and procedures on CSSP to address the fraudulent data and reporting.

Among other things:

36. In June 2016, Dr. Barrett began finding significant discrepancies in data reporting from the field (Afghanistan) and initiated new data verification procedures with her Afghan local national Monitoring and Evaluation ("M&E") team regarding the training and mentoring data being reported. Despite her substantial interventions at the managerial level, no actions were taken by PAE CSSP management to support the new procedures.

37. In July 2016, Nick Zyznieuski was hired as a Monitoring and Evaluation M&E Quantitative Analyst. Dr. Barrett tasked him with improving data verification and reporting.

38. From her date of hire until the end of October 2016, Dr. Barrett reported directly to Roland Taylor ("Mr. Taylor"), CSSP Program Implementer.

39. Similar to the work Dr. Barrett performed on JSSP (under a different PAE management team), she was attempting to put into place verification systems for the CSSP quantitative data on training and mentoring (outputs), as well as more effectively track program outcomes (quantitative and qualitative indicators).

**PAE Engaged in Corrupt and Noncompliant Construction Practices in Violation of its Contractual Duties to INL**

40. In or about July 2016, Dr. Barrett's M&E Team Lead in Kabul, Yama Ahmad Wardak ("Mr. Wardak"), reported a problem with a construction project in one of the prisons, which Dr. Barrett relayed to the CSSP Construction Manager in the Arlington PAE office. The problem involved improper reporting of allegedly completed work. The Construction Manager asked his construction team on the ground in Kabul to investigate whether or not the work had been performed and, if so, had been done properly. Shortly thereafter, Mr. Wardak contacted Dr. Barrett and retracted his statement, stating he had been mistaken. Dr. Barrett began observing gaps in construction reporting and a lack of GPS coordinates to verify locations and photographs.

When Dr. Barrett questioned PAE management about the veracity of the construction reporting, Mr. Taylor stopped sharing construction reports with her.

41. In that same time period, Dr. Barrett began receiving pushback from PAE GLSO and CSSP Management on her overall data verification initiatives and monitoring of construction projects. From the outset of her employment with PAE, Dr. Barrett's attempts to address the fraudulent reporting were continually ignored and her suggestions discounted and disregarded by PAE management.

**PAE Ignored and Failed to Act on Dr. Barrett's Reports of Surveillance, Stalking and Harassment**

42. Also beginning in July 2016, Dr. Barrett filed several non-emergency reports with the Fairfax County Police Department ("FCPD") regarding surveillance, harassment, and vandalism of her car.

43. The two FCPD police officers that Dr. Barrett spoke to were familiar and knowledgeable about this type of stalking of people who work in the type of fields that Dr. Barrett works in and who have worked overseas.

44. According to the FCPD, the stalking that Dr. Barrett experienced was due to her job, since she was working in the field of policing and corrections. Dr. Barrett's work sometimes involves people being tried in courts that are, in part, funded by Americans, and people being sentenced and incarcerated in American-funded prisons.

45. One of the FCPD police officers told Dr. Barrett that people working in her field, including themselves as police officers, are on "lists" and are continuously harassed with similar behaviors to what Dr. Barrett has experienced (e.g., knocking on their doors at night). He recited a list of harassing behaviors, some of which Dr. Barrett experienced. He predicted that the

harassment would stop if she changed jobs. Another of the FCPD officers voiced the same opinion.

46. The officer who responded to the initial call had a similar case five years previously and offered to build a case.

47. Dr. Barrett reported the stalking to Mr. Taylor around July 2016. Mr. Taylor, who is a former FCPD police officer, and who also worked in international policing overseas, understood and was versed in this type of stalking. He gave her instructions and advice about handling it, but took no other action to address her safety and security.

48. In August 2016, while Dr. Barrett was working at PAE's headquarters office, a man who fit the pattern of her stalkers came up to her while she was sitting at her desk and said, "Hello, [long pause] Kerrin" before leaving. She had never seen this man before, nor would again.

49. Several of Dr. Barrett's PAE coworkers were aware of the stalking she experienced, and they had seen the stalking and/or evidence of the stalking, including Dave Pidone ("Mr. Pidone"), a contractor working for PAE, military officer, and former counterterrorism advisor in Iraq; Nick Zyzneuski ("Mr. Zyzneuski"), M&E Specialist with PAE; and Jessica Singh ("Ms. Singh"), Program Operations Officer with PAE.

50. One time, Dr. Barrett, Mr. Zyzneuski, and Ms. Singh were sitting outside at a restaurant in Arlington, when one of the stalkers approached Dr. Barrett and stood by her, staring at her, frightening all of them.

51. Despite multiple instances of surveillance and stalking of a female employee, witnessed by co-workers, PAE took no action to address Dr. Barrett's security, demonstrating its gender bias and complete disregard for employees' safety in the workplace, underscoring its overall

dismissive attitude toward Dr. Barrett's complaints to PAE management regarding the ongoing fraudulent data reporting on the contract.

**PAE Fraudulently Reports Training and Mentoring Data to INL in Violation of its Contractual Duty to INL**

52. Throughout the Summer of 2016, by analyzing field data and reporting, Dr. Barrett and Mr. Zyznueiski discovered that training and mentoring numbers were being substantially inflated (approximately three times as high as actual numbers) through the reporting of "instances" of training and mentoring, rather than actual persons trained and mentored. Therefore, if two Afghan local national prison staff took training, with one taking two courses and the other taking three courses, this was being reported as a total of five persons trained instead of two persons trained, dramatically increasing the output data for CSSP and making it appear as though the program, and PAE's management thereof, was far more successful than in reality.

53. Similarly, mentoring numbers were being substantially inflated. One corrections officer (or other prison personnel) was being counted instead as the number of CSSP Local National (LN) Advisors who visited him. Therefore, if four LN Advisors met with one Prison Commander one time in a month, that was being reported as four prison commanders mentored in a month. (If the numbers are reported correctly, the mentoring should be reported as, for example, one prison commander mentored for say, a one 1 hour visit in one month - regardless of the number of mentors who attended the meeting.)

54. Therefore, if a prison commander is mentored 1 hour in 2 sessions per month by say, 2 LN Advisors, that should be reported as 2 hours of mentoring for 1 person (prison official). Instead, it is 1 X 2 X 2= 4 hours of mentoring for 2 persons (a prison commander becomes 2 persons because each LN reports the same visit). As a second example: If the Gender Team @ 3 females goes into a prison on a monthly visit and mentors a prison official for 3 hours, that is 1

11

prison official receiving 3 hours of mentoring in one month - not 3h X 1 official X 3 LN Advisors = 9 hours and 3 prison officials, which is what was being reported.

55. Additionally, mentoring hours were being reported by Afghan advisors as high as 37 hours in a week on PMP reporting and timesheets - an impossible standard, particularly in Afghanistan with limited communications and constant security issues to overcome when traveling on field visits.

56. American Advisors were also over-reporting the number of hours they mentored their Afghan counterparts.  Given the security issues in Kabul, their travel was constrained substantially.  Therefore, they were allowed to conduct mentoring over the phone or Skype. When Dr. Barrett questioned the use of Skype given the lack of Internet availability in the country, her Afghan M&E team informed her that Afghan mentees did not have access to it and, therefore, the American Advisors could not have mentored the number of hours being reported. Dr. Barrett removed mention of Skype numbers from the monthly reporting, informing the CoT of this issue.  He insisted Dr. Barrett put the Skype mentoring back in the report.

57. In regular meetings with the INL CSSP Program Officer, the training and mentoring data was called into question by the Program Officer; namely, the M&E numbers were approximately one-third of those the Program Officer was aware of in other PAE reporting.

58. These meetings were always attended by at least one senior manager in the division, either Alison Eastridge or William Lietzau.  Dr. Barrett continually and consistently emphasized that the M&E training and mentoring data (the approximately 4,000 figure) was a more accurate representation of programmatic outcomes than the inflated (approximately 12,000) figure since it was based on actual persons trained and not "instances" of training.  Thus, PAE's management team was aware of the fraudulent reporting and Dr. Barrett's attempts to correct it.

12

59. From the M&E team, Mr. Zyznieuski also attended all meetings with the INL CSSP client, with Jessica Singh, Program Operations Officer often also attending.

60. Also during the summer of 2016, the INL CSSP Program Officer, aware of Dr. Barrett's successes in evaluating the JSSP program, asked if she could prepare a similar outcomes-based report for the CSSP program. Dr. Barrett agreed and led an evaluation effort, which produced the requested report and, at the same time, also revealed significant gaps in prison monitoring and data.

61. Throughout September to December 2016, Dr. Barrett continued to attempt to introduce data verification initiatives to address this fraudulent reporting, along with designing and developing training materials for Kabul field staff to address the "instances" problem.

62. The planned training of the CSSP project staff to address the "instances" problem and teach basic M&E principles never materialized in Kabul; it was blocked by Mr. Williams. The training remained localized to Dr. Barrett's M&E team.

63. As part of the new data verification initiatives, Dr. Barrett introduced the mobile surveying software SurveyCTO, which is designed for implementation in developing nations.

64. Dr. Barrett was excluded from weekly CSSP project management calls despite her senior level position and responsibility for reporting on program progress.

65. During that same period, Dr. Barrett discovered additional reports outside the M&E department with inflated CSSP training and mentoring figures.

66. At Dr. Barrett's direction, the M&E department began adding the descriptor "Distinct Trainees" to the required monthly M&E Program Management Plan (PMP) reporting, in an attempt to distinguish between instances of training and mentoring and actual people.

**PAE Fraudulently Reports Industries Data to INL in Violation of its Contractual Duty to INL**

67.  In October 2016, Dr. Barrett sent members of her Kabul team on prison monitoring site visits, which revealed the Industries data being reported in the PMP was wildly inaccurate. Some prisons that did not even have an Industries program were reporting dozens and even hundreds of prisoners being trained.  Dr. Barrett asked Mr. Wardak, the M&E lead in Kabul, to investigate this finding with the Afghan Advisor for Industries, who laughed at him.  Dr. Barrett reported these fraudulent findings to the CoT; however, he took no action to change the reporting or introduce data verification procedures on Industries data.  Dr. Barrett instructed her M&E staff to include a note on all monthly reporting that the Industries data could not be verified.

**Dr. Barrett Takes Additional Significant and Wide-ranging Steps to Address the Fraudulent Over-reporting of Data and Outcomes to INL**

68.  Also in October 2016, and in response to the INL CSSP Program Officer's continued confusion over PAE's over-reporting of training and mentoring numbers, Dr. Barrett requested a web hosting service for the M&E team's proposed new database initiative.  The initiative would have enabled CSSP staff in remote prison sites to enter PMP data training and mentoring data directly into a database.  There was significant delay and pushback from PAE's Information Technology Department and from GLSO management on this initiative.

69.  In November 2016, Dr. Barrett requested access to paper sign-in sheets to verify training and mentoring data, standard M&E practice.  All data to populate the PMP was phoned in to the M&E team based in Kabul, a highly irregular practice, especially given the rampant corruption in the country.  The CoT responded to Dr. Barrett's request, stating that paper records are not necessary for data entry into the PMP.  His strong resistance to the Kabul team's obtaining actual

paper training/mentoring logs, again for data verification purposes, is evidence of PAE management's full knowledge of the fraudulent reporting.

**Mr. Lietzau Fails to Take Action on Dr. Barrett's Security Concerns**

70. Around this same time period, Dr. Barrett spoke to Mr. Lietzau about the stalking while the two of them were meeting near Dr. Barrett's desk at PAE. Mr. Lietzau indicated that he understood the subject and was familiar with such efforts at intimidation. He commented that he had dinner with a man who had to move to a different location every night because he was receiving death threats from extremist elements in the Muslim community.

71. In about November 2016, Dr. Barrett again spoke to Mr. Lietzau about the stalking. The two of them were walking to lunch when Mr. Lietzau asked Dr. Barrett how things were going, and she told him that she was still experiencing the stalking and harassment. She said that she had reported it to the FCPD. Mr. Lietzau again indicated his familiarity with the subject and gave as an example that his name, children's names, and family's address had been posted on the Twitter account of ISIS.

72. PAE still took no action to ensure Dr. Barrett's safety and security in the workplace. Her reports of surveillance and stalking were discounted and ignored by management.

**PAE Refuses to Implement Measures to Combat the Fraudulent Reporting of CSSP Data**

73. In December 2016, Dr. Barrett was told by Ms. Eastridge that PAE would not host the M&E database due to "security concerns", even though similar databases were hosted for other PAE projects and clients.

74. In keeping with contractual obligations and general principles of development work, also in December 2016, Dr. Barrett directed her Kabul M&E team to conduct M&E capacity building in the Afghanistan prisons. Dr. Barrett asked the M&E Team Lead to begin collaborating with

Afghan Government prisons to cross-verify the prison data as part of the program's capacity building effort for local national prison staff.  Team members were training and mentoring M&E staff in the central Kabul prison (Poli-char-kee) and providing technical support to resuscitate their aging, non-functioning training database when the CoT Mr. Williams halted the work and refused to approve further travel to the prison. Mr. William's actions effectively ended the M&E team's training and mentoring of the prison's M&E staff and training database repairs and improvements, aimed at building internal capacity and further verifying training and mentoring data on the CSSP program.

75.  Laura Sands was the CSSP Program Officer for the majority of Dr. Barrett's employment with PAE.

**Dr. Barrett Continues to Experience Surveillance and Stalking Incidents in PAE's Workplace, Witnessed by Multiple Co-Workers Yet PAE Still Takes No Action**

76.  Dr. Barrett continued to experience surveillance and stalking incidents in PAE's workplace in 2017.

77.  Mr. Pidone and Mr. Zyznieuski had witnessed these incidents in the basement of the PAE parking garage late at night. Around February 2017, Mr. Pidone walked Dr. Barrett to her car in the parking garage. He saw some vandalism that had recently been done to her car and witnessed a Middle Eastern man walk with them as they walked to Dr. Barrett's car, even though the man's car was parked on a different floor of the parking garage overlooking Dr. Barrett's car. There were no other cars on either floor at that time.  Mr. Zyznieuski also saw a Middle Eastern man near Dr. Barrett's car while they were walking into the parking garage on an occasion in January or February 2017.

78. As a result of witnessing the vandalism and stalking incident, Mr. Pidone recommended that Dr. Barrett carry a concealed weapon, he was so concerned for her safety based on his knowledge and experience from serving in the military in Iraq and Afghanistan.

**PAE Blocks All Efforts to Verify Data and Improve Data Reporting on CSSP Under Its Contractual Obligation to INL**

79. From January 2017 to March 2017, PAE responded to the INL Request For Proposal (RFP) for CSSP.  Dr. Barrett drafted the M&E section, adding substantially more rigor to procedures for data verification and reporting. An integral part of this effort included a new baseline study, designed to include assessing how much of the donations (e.g., coats, blankets, feminine hygiene products, etc.) were actually getting to the prisoner population, as well as the actual state of construction projects (no external monitoring was being done, the Afghan engineers on CSSP reported their own work).

80. During this same period, PAE management, led by Ms. Eastridge, co-opted the remote monitoring initiative, a centerpiece of the new M&E strategy, attempting to replace the M&E team's SurveyCTO mobile surveying software with their own proprietary crime scene software that would have to be substantially modified to adapt to the M&E context.  The proprietary software would also be priced well out of range of the Afghan Government budget, with affordability a key element in creating sustainable justice systems.

81. In March 2017, with Dr. Barrett's encouragement and approval, the M&E Database Officer and Team Lead/Kabul wrote and submitted a revised database design for management approval.  The database would have ensured all trainees/mentees had unique IDs, essential for accurate reporting.  Real time tracking of data would be possible.  Mr. Williams flagged the database effort and real-time access for INL for "the trouble it will cause".  He said that PAE needed to see the data first, before INL sees it.

**Dr. Barrett Requests a New Mobile Phone Due to Security Concerns**

82.  In March 2017, concerned that her PAE SIM was being tracked, Dr. Barrett requested that she receive a new mobile phone from PAE's IT department. IT refused to issue a new phone. Mr. Pidone helped Dr. Barrett write her response, but her request remained unfulfilled.

83.  On or about May or June 2017, PAE issued an announcement that all employees would be issued a new mobile phone under a new service plan contract. Dr. Barrett contacted IT to ensure that she would be at the top of the list. One of the IT technicians, an Afghan woman who had worked for the U.S. Embassy in Kabul and now in the United States on a Special Immigrant Visa, responded to the IT request. In a conversation in the hallway of the 7th floor, Dr. Barrett told the woman why she wanted a new phone. The woman became concerned. She was well-familiar with this type of stalking, saying, "They used to follow us all over Kabul. Now you know why we are here."

**PAE Awarded New CSSP Contract and Mr. Lietzau Threatens Dr. Barrett with Termination**

84.  In May 2017, INL awarded a new CSSP contract to PAE.  Significant CSSP budget cuts were proposed by PAE Management after contract award due to a poor pricing strategy designed to maintain the status quo of high salaries on the Justice Support System Program (JSSP).  In a meeting with Mr.  Lietzau, he told Dr. Barrett that she could accept an incremental "pay out" now, reducing her salary, or keep her same salary over the next five years.  He then said he would have to fire her because she did not yet have a security clearance.  Dr. Barrett responded that PAE lost her security clearance paperwork twice; it was not her fault that her clearance had been delayed for months.

85.  Throughout April and May 2017, Kabul M&E Database Officers were trained in SPSS quantitative analysis software and the new data verification process.

86.   During that period, the new web-based database was under development, and enhanced processes and procedures drafted to combat the over-reporting of training and mentoring data, and to attempt to determine actual outputs and outcomes from other CSSP tasks, including construction projects and prison donations.

**Discovery of a "FACT Sheet" with Falsified CSSP Training and Mentoring Data Resulted in PAE Threatening the Monitoring and Evaluation Local National M&E Team**

87.   In or about May 2017, Mr. Zyznieuski called to Dr. Barrett's attention the discovery of a "FACT sheet" being sent to the INL CSSP Program Officer by the PAE Kabul office indicating triple the number of trainees as compared to M&E reporting.  The M&E Team Lead in Kabul subsequently emailed Dr. Barrett to inform her that he was being pressured by the CoT to change the M&E numbers to align with higher numbers (approximately 12,000) being reported in the FACT sheet.  Dr. Barrett emailed the M&E team and told them to report the correct figure from the PMP, and then alerted the CoT, stating that lower figure (approximately 4,000) is the more accurate figure (although that number had never been fully verified) and that the M&E Team figures did not correspond with the FACT sheet reporting.

**PAE Blocks the Significantly Improved Monitoring and Evaluation Processes and Procedures being Implemented under the New CSSP Contract in Violation of its New Contract under INL**

88.   In May 2017, the INL Program Officer, Laura Sands, was given a demonstration of new web-enabled M&E database by Dr. Barrett, Mr. Zyzneuiski and Ms. Singh and approved of its implementation.  Ms. Eastridge was present in that meeting.  However, PAE Management, fearing that the actual training and mentoring numbers would be readily available to INL in contradiction to the falsified much higher numbers being reported out of Kabul, pushed back on its implementation, effectively freezing the new initiative.

89.  Also in May 2017, Dr. Barrett wrote the then PAE President, Karl Williams ("Mr. Williams"), with a list of process improvements needed at the company to address significant performance gaps in PAE infrastructure severely impacting efficiency and effectiveness of programs, including and especially CSSP. Mr. Lietzau reviewed the letter, which included proposed improvements, and, at the suggestion of co-worker Mr. Pidone, Dr. Barrett met with the President in early June.  Although the President was verbally supportive, no actions were taken by either Mr. Williams or Mr. Lietzau to remedy any of the problems.

90.  In June 2017, a month after PAE was awarded the new CSSP contract, Dr. Barrett was attempting to put into place significantly enhanced verification systems (as proposed in PAE's proposal for the new contract award) for the CSSP quantitative data on training and mentoring (outputs), as well as more effectively track program outcomes (quantitative and qualitative indicators).  As part of this effort, she was going to include construction and donations (the other two CSSP program components, each valued in the millions of USD) in the CSSP M&E monitoring and reporting.  [The norm in M&E is that the entire program/project is monitored and evaluated by the M&E team, not only one activity.]

91. With the support of the INL CSSP Program Officer, Dr. Barrett began development of a new M&E Concept Note, which included adding more monitors to the M&E Team in Afghanistan to address the ongoing data verification and fraudulent reporting issues.

92. Also in June 2017, after substantial effort on the part of Dr. Barrett and her M&E team, an outside web hosting service was approved by the INL COTR, since PAE refused to host the new database.  Additionally, the new M&E database and implementation plan were in final revision, to include unique IDs for trainers/trainees and mentors/mentees and liaison with GDPDC prison staff.

93. That same month, concerned about the continuing wide disparity in training and mentoring numbers being reported from PAE, the INL CSSP Program Officer approved Dr. Barrett's request to double the size of her Kabul M&E Team, when all other departments were taking severe cuts in budgets and staff allocations.

94. Also in June 2017, as a critical part of the significantly enhanced data verification process under the new CSSP contract, Dr. Barrett proposed a baseline survey of 9 prisons that had never before been monitored, and the beginning of data verification for the PMP reporting using SurveyCTO and GPS location data. The third party monitor who successfully conducted the previous CSSP survey in Fall 2016 was a part of that survey design.

95. That survey was never implemented; only the Kabul prison was surveyed by the M&E team after PAE retaliated against Dr. Barrett on July 13, 2017.

96. By the end of June 2017, PAE management had stalled on approving the new database, and its implementation plan.

97. Dr. Barrett once again received significant CoT pushback on the database implementation plan and GDPDC (Afghan Government) prison staff collaboration/ capacity building in M&E; in essence, the initiative was put on hold.

98. On or about July 3, 2017, Dr. Barrett approached Mr. Lietzau concerning the CSSP budgetary crisis that had unnecessarily severely and negatively impacted the program. Mr. Lietzau responded that he could not take any actions to change the dire fiscal situation on the contract.

## PAE Retaliates against Dr. Barrett because of her Lawful Acts to Stop PAE's FCA Violations

99. A constellation of proposed and partially completed new and significantly enhanced M&E data verification activities on the CSSP contract, led by Dr. Barrett, took place in the days

and month preceding the decision by PAE management to take a retaliatory action against her that shocks the conscience.

**Per Mr. Lietzau's Instructions, Dr. Barrett Reports a Stalking Incident to PAE Security**

100.     The first week in July 2017, Dr. Barrett and Mr. Zyznieuski were testing the new SurveyCTO mobile surveying application for deployment in the field to gather data at the prison sites using GPS data points for the first time.

101.     On or around July 6, 2017, On July 6, 2017, Dr. Barrett left PAE's Arlington offices and began walking to a nearby Starbucks coffee shop with the intent of testing the new mobile application outside the office where there would be better wifi reception. As she did so, she passed through the courtyard outside of her building, which an adjacent building shared. There, Dr. Barrett noticed a South Asian man look at her and then urgently take out his cell phone and make a call.   Dr. Barrett continued to Starbucks and purchased her coffee.   Upon returning to the courtyard outside of her office building approximately 30 to 45 minutes later, Dr. Barrett went into the office building adjacent to hers and asked the security guard in that building's lobby if anyone who worked there matched the description of the man Dr. Barrett had seen in the courtyard. The security guard told her that a number of South Asian men worked on the eleventh floor of that building.

102.     On July 10, 2017, Dr. Barrett told Mr. Lietzau about this incident and asked him what he would do. Dr. Barrett knew that, as Mr. Lietzau was earlier involved in helping to run the operations at Guantanamo Prison, and his name and address had been published on ISIS's Twitter feed, he was familiar with this type of situation and the intimidation tactics used against people in their field. Mr. Lietzau said that it sounded like Dr. Barrett had been "bugged" and

suggested that maybe someone had put something in her purse. He told her to speak to Mr. Horner, a Security Manager at PAE.

103.    In her conversations with Mr. Lietzau, Dr. Barrett did not threaten anyone or indicate that she intended or planned to undertake any violent act towards herself or anyone else. Nor did Mr. Lietzau believe that Dr. Barrett was capable of hurting another person.

104.    At the end of the day on July 10th, Dr. Barrett met with Mr. Horner. She explained the incident from the prior week and the background of the stalking she had been experiencing. While she described these situations, Mr. Horner appeared impatient and often looked at his watch. He gave an appearance of not knowing what Dr. Barrett was talking about with respect to the stalking and showed no curiosity or interest in the subject.

105.    Before his employment at PAE, Mr. Horner had been a CIA intelligence officer with extensive experience in the Middle East. As such, he knew, or should have known, about the existence of networks that originate in Middle Eastern counties and spread to other countries, including the United States, to harass, stalk, and threaten individuals in the United States who have worked in the Middle East, particularly on sensitive projects related to law and justice. Thus, when he spoke to Dr. Barrett, Mr. Horner was feigning a lack of knowledge or understanding about Dr. Barrett's stalking concerns.

106.    Mr. Horner asked Dr. Barrett if she owned a gun. She said yes, that she is a registered firearm owner.

107.    Dr. Barrett bought her gun more than ten years earlier, in or around 2006. In July 2017, the gun was in a storage closet in her home, in its original case.

108.    Dr. Barrett received training in gun use before she bought her gun in 2006. She has never used her gun. In May 2017, at the instance of Mr. Pidone to obtain a concealed carry

license, she took an NRA self-defense course, sponsored by the Isaac Walton Society, on "Women on Target." She used an NRA-provided gun for the class and did not use her gun.

109.    The women's self-defense course described above satisfied Virginia's concealed carry permit law requirement. As of July 13, 2017, Dr. Barrett had not applied for the permit.

110.    In her conversations with Mr. Horner, Dr. Barrett did not threaten anyone or indicate that she intended or planned to undertake any violent act towards herself or others.

111.    The next day after her meeting with Mr. Horner, Dr. Barrett and Mr. Horner exchanged emails about the situation. Mr. Horner used the phrase "possible following," at which point Dr. Barrett thanked him for his time and politely cut him off, feeling that there was no point in continuing to discuss this with him if he did not believe her and given his apparent lack of interest the day before. Moreover, the FCPD was already notified, as was her direct supervisor, Mr. Lietzau.

112.    In the early evening of July 11, 2017, Ms. Wilborn, a human resources manager at PAE, met with Dr. Barrett.  In her conversations with Ms. Wilborn, Dr. Barrett did not act violently, threaten anyone or indicate that she intended or planned to undertake any violent act towards herself or others.

113.    After speaking to Dr. Barrett on July 11, 2017, Ms. Wilborn emailed Mr. Horner about the conversation she had had earlier that evening with Dr. Barrett.  On July 12, 2017, Ms. Wilborn discussed with Mr. Horner and others, including PAE's in-house legal staff, the conversation she had had the day before with Dr. Barrett.

114.    In those conversations, Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, and Ms. Wilborn, and possibly others, coached by PAE's legal team (led by Mr. Cobb), agreed on a plan to use Dr. Barrett's reports of being stalked at the office to discredit her in the manner described

earlier (i.e., falsely claiming that she was a threat and danger to others that required her immediate removal from the office and transportation to a hospital for examination), and for the purposes described earlier (i.e., PAE's fear that exposure of the fraud involving the CSSP contract would damage the professional reputations of PAE management in charge of the program; PAE's failure to maintain security in its offices which would jeopardize its business both current and future; ensuring Dr. Barrett would never be able to obtain a security clearance, a requirement for her position; ending her employment with PAE; and ending the scrutiny of PAE's reporting and billing practices which she brought forward).

115.    In executing the plan, on or around July 11, 2017, Mr. Horner contacted the Arlington County Police Department ("ACPD") and spoke with Officer Hall and Officer Luzier about Officer Hall and Luzier coming to PAE's offices to remove Dr. Barrett from the workplace and having her sent to a hospital for examination based on the pretense that she was a threat and danger to others. In addition, on or about July 11, 2017, Mr. Horner contacted the Arlington DHS to claim that Dr. Barrett was a threat and danger to others and to discuss committing her to a psychiatric facility for a mental illness.

116.    At around 6:00 p.m. that day (July 11th), Ms. Wilborn, the HR Manager at PAE, appeared at Dr. Barrett's desk and asked Dr. Barrett to meet with her. This is the first time Dr. Barrett had ever met Ms. Wilborn. Dr. Barrett willingly met with her and spent about 45 minutes calmly describing the incident she had reported and the background information. Dr. Barrett gave Ms. Wilborn three business cards for the FCPD police officers she had spoken to, and it appeared that Ms. Wilborn made copies of the cards.

117.    Ms. Wilborn indicated that she had no awareness or familiarity with the type of stalking behavior described by Dr. Barrett.

25

118.     Ms. Wilborn asked Dr. Barrett if she would be agreeable to talk to the police (the ACPD). Dr. Barrett willingly agreed to do so at PAE's offices and to have the police investigate the July 6th stalking incident. She also wanted to formally put the incident on record.  In addition, in the past, going to the police had helped discourage the stalkers, so she felt that speaking with the police in Arlington County (where PAE's offices are located) would be as helpful as going to the Fairfax County police had been.

119.     Ms. Wilborn also asked if Dr. Barrett had PAE colleagues who could corroborate her account. Dr. Barrett identified Mr. Zyzneuski, Ms. Singh, and Mr. Pidone. In addition, as described earlier, Mr. Lietzau was already aware of the phenomenon of intimidation that Dr. Barrett was experiencing.

120.     In her conversations with Ms. Wilborn, Dr. Barrett did not threaten anyone or indicate that she intended or planned to undertake any violent act towards herself or others.

121.     On the morning of July 12, 2017, Mr. Horner called Mr. Zyzneuski and Ms. Singh into his office (separately) to discuss what Dr. Barrett had reported.

122.     Mr. Zyzneuski met with Mr. Horner and another PAE employee. They asked him if he knew about the stalking, if he thought that it was valid, and if he had seen evidence of it. Mr. Zyzneuski said that he had seen some evidence (photos and videos that Dr. Barrett had shown him), had no reason to disbelieve the stalking, and was concerned about Dr. Barrett's safety. Mr. Zyzneuski did not inform Mr. Horner that Dr. Barrett had made any threatening statement or that he (Mr. Zyzneuski) believed that Dr. Barrett posed a threat to herself or others.

123.     Mr. Horner told Mr. Zyzneuski that Dr. Barrett was a "liability." It was apparent to Mr. Zyzneuski that Mr. Horner was protecting PAE's interests, not Dr. Barrett's, and that Mr. Horner was worried about "blackmail."

124.    Ms. Singh told Mr. Horner and Ms. Wilborn about what she knew about the stalking incidents, including confirming the restaurant incident that she witnessed with Ms. Wilborn. Ms. Singh gave a supportive statement on Dr. Barrett's behalf to Ms. Wilborn and said that she was concerned for Dr. Barrett's personal security and safety. Ms. Singh did not inform Mr. Horner that Dr. Barrett made any threatening statement or that she (Ms. Singh) believed that Dr. Barrett posed a threat to herself or others.

125.    On July 12, 2017, Mr. Horner telephoned the non-emergency line for the Arlington County Police Department and asked to speak to a police officer about Dr. Barrett.

126.    On July 12, 2017, Officer Hall and Officer Luzier were dispatched to respond to Mr. Horner's non-emergency call.   The police dispatcher did not indicate that the call from Mr. Horner was an emergency.   Neither Officer Hall nor Officer Luzier traveled to PAE's offices with their emergency lights or sirens activated in their police cars.

127.    On July 12, 2017, at Mr. Horner's request, Officer Hall and Officer Luzier visited PAE's headquarters and met with Mr. Horner and possibly others at PAE. At that meeting, the officers agreed to remove Dr. Barrett from the workplace, regardless of her answers to the police officer's questions, based on her ostensibly being a threat and danger to others.   Nevertheless, after Officer Hall and Officer Luzier left PAE's offices on July 12, 2017, Officer Hall took no further actions regarding Dr. Barrett that day.

128.    Mr. Horner also agreed to contact the Arlington County Department of Human Services ("DHS").  Mr. Horner telephoned Alexis Mapes, a supervisor at DHS's Emergency Services, and described what Dr. Barrett had told Mr. Horner and what Dr. Barrett had told Ms. Wilborn as Ms. Wilborn then described Mr. Horner.

129.    At no time did Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, Ms. Wilborn, or any other PAE employee contact the Fairfax Country Police Department ("FCPD") to validate Dr. Barrett's surveillance and stalking situation, despite having the information to do so.

130.    At no time did Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, or Ms. Wilborn, or any other PAE employee, inform the Arlington police officers or DHS Emergency Services that Dr. Barrett worked in a highly sensitive position and had contacted Fairfax County police, who affirmed that Americans in her position are surveilled, stalked and harassed by foreign entities, some of which are High Value Targets operating out of Afghanistan's prisons.

131.    Because, however, Dr. Barrett was working from home and not in PAE's offices on the morning of July 12th, Mr. Horner, Ms. Wilborn, Mr. Lietzau, Ms. Eastridge, Mr. Greene, Officer Hall, and possibly other PAE employees (coached by PAE's legal team, led by Mr. Cobb) and Officer Luzier agreed that the police would return the next day (July 13th) to PAE's offices to remove Dr. Barrett from the workplace and have her sent to a hospital for evaluation.

132.    At the end of the day (July 12th), Dr. Barrett told Mr. Lietzau that Mr. Horner had not been helpful, and Mr. Lietzau responded, "I've heard all about it", while looking knowingly at Lisa Chavez, his financial officer.

133.    In an email sent the afternoon of July 12th, obtained from the Arlington Police Department (not PAE), Mr. Horner apologized for Dr. Barrett's absence from the office on July 12th, laying down the gauntlet that if the officers would not "take care of her", PAE would do so "privately."

**PAE Retaliates Against Dr. Barrett by Conspiring with Arlington County Officials to have her Seized from PAE's Offices on July 13, 2017**

134.    On the morning of July 13, 2017, after Mr. Horner learned from Dr. Barrett's manager, Allison Eastridge, that Dr. Barrett was at PAE's offices, he called the Arlington County

Police Department non-emergency telephone number to request that the officers he had spoken to the day before return to PAE's offices to speak to Dr. Barrett.

135.    Officer Hall and Officer Luzier were dispatched to PAE's offices again on July 13, 2017.  The radio dispatch call did not indicate that the call concerning "an emotionally disturbed person" was high priority, and there were no lights and sirens.

136.    When Officer Hall and Officer Luzier arrived at PAE's offices on July 13, 2017, they spoke with Mr. Greene, Mr. Lietzau, Mr. Cobb, Ms. Eastridge, Mr. Horner, and Ms. Wilborn, and possibly others at PAE, all coached by PAE's legal team, for at least thirty minutes to discuss the plan of removing Dr. Barrett from the workplace, regardless of her answers to the police officer's questions, based on the pretense that she was a danger and a threat to others and needed to be sent to the hospital for a mental evaluation.  (Despite multiple calls to DHS, Mr. Horner gave sworn testimony in February 2019 that he did not alert the police that Dr. Barrett posed a danger to herself or others but had called them to inquire whether they would be able to help her, including help her investigate her stalking claims.)

137.    On July 13, 2017, Dr. Barrett attended a 9:30 a.m. budget meeting in the office with Allison Eastridge ("Ms. Eastridge"), Mr. Zyzneuski, and Ms. Singh. Ms. Eastridge had scheduled the meeting only the day before (indicating PAE's plan to ensure Dr. Barrett would be in the office this time).  Their meeting was amicable, with Dr. Barrett agreeing to Ms. Eastridge's suggested changes to the M&E budget, even though they adversely impacted her team's ability to implement the new, stricter, monitoring standards.

138.    After the meeting ended, Ms. Eastridge phoned Ms. Wilborn to tell her Dr. Barrett was leaving her office so that Ms. Wilborn could intercept Dr. Barrett just as she reached her

desk, to ensure Arlington Police officers would be able to seize her on that day, as they had planned to do the previous day, but had failed.

139.    Ms. Eastridge, Ms. Wilborn and Mr. Greene were all close friends who socialized together.  Ms. Wilborn and Mr. Greene were involved in a romantic relationship.

140.    Mr. Lietzau and Mr. Cobb were close friends, with a shared military background. Mr. Lietzau had arranged for Mr. Cobb's youngest daughter to intern with Dr. Barrett in Summer 2016, and plans were in place for Mr. Cobb's elder daughter to intern with Dr. Barrett in Summer 2017.

141.    When Dr. Barrett returned to her desk after the meeting, Ms. Wilborn approached her nervously and asked her to speak to the police, who were waiting in a conference room, setting into motion their plan to lure Dr. Barrett into the conference room so that the officers could seize her.

142.    Dr. Barrett willingly went to the conference room to speak to the police. She thought that she was reporting the July 6th stalking incident to them.

143.    When Dr. Barrett arrived in the conference room, Officer Hall and Officer Luzier were sitting on one side of the conference table. They were both over six feet tall and physically imposing. Dr. Barrett and Ms. Wilborn sat down opposite them, with Ms. Wilborn closest to the door.

144.    Dr. Barrett had never met or interacted with either officer in the past.

145.    Officer Luzier said to Dr. Barrett that he would like to ask her some questions.

146.    Dr. Barrett willingly agreed. She expected that this was a fact-finding interview, similar to the times she had reported the stalking to the Fairfax County Police Department.

147. Officer Luzier asked Dr. Barrett if she would like Ms. Wilborn to stay, and Dr. Barrett said that she was fine either way. Ms. Wilborn chose to stay and sat next to Dr. Barrett at the conference table.

148. Officer Luzier asked Dr. Barrett what had happened. Dr. Barrett calmly described the July 6th incident. She said that she could have been mistaken and misperceived what had happened, but that the incident fit the pattern of the stalking she had been experiencing since living in Dubai. Dr. Barrett explained the background of the stalking behavior and the related cultural issues to Officer Hall and Officer Luzier.

149. In contrast to the FCPD officers, Officer Luzier did not appear to believe the stalking phenomenon that Dr. Barrett was describing to him. He was aggressive and mocking in his behavior, disrespecting of Dr. Barrett in both his tone of voice and demeanor from the beginning.

150. The questioning and behaviors exhibited by Officer Luzier were those of an interrogation of a suspect, not an interview. Dr. Barrett is well-versed in the difference between the two methods of information-gathering by police due to her background in designing training manuals for international policing.

151. Ms. Wilborn and Officer Luzier left the room together after completing the first round of interrogation. While outside the room, Officer Luzier continued to discuss with Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, Mr. Cobb, and Ms. Wilborn and possibly others at PAE, including PAE's legal team, the plan of removing Dr. Barrett from the workplace and sending her to the hospital for a mental evaluation, regardless of how she answered Officer Luzier's questions.

152. Officer Luzier returned with Ms. Wilborn and began questioning Dr. Barrett about her gun. Dr. Barrett explained that her colleagues in law enforcement had advised her, based on

their observations and experience of similar behavior to what she was experiencing, to obtain a concealed carry permit. She told Officer Luzier and Officer Hall that she had attended an NRA self-defense training course for women but had not yet applied for the permit, as she was ethically uncomfortable with carrying a weapon, and, in any event, she was not allowed to have a weapon in the workplace.

153.   At this point, Ms. Wilborn glanced over at Officer Luzier. Officer Luzier remained silent. Ms. Wilborn and Officer Luzier then left the room, again together. Officer Hall remained in the room.

154.   While outside the room, Officer Luzier continued to discuss with Mr. Greene, Mr. Lietzau, Mr. Horner, Mr. Cobb, Ms. Wilborn and possibly others at PAE, including from the legal team, the plan of removing Dr. Barrett from the workplace and sending her for a mental evaluation, regardless of her answers to Officer Luzier's questions.

155.   When Officer Luzier and Ms. Wilborn returned, he asked Dr. Barrett if she had practiced with the gun. He stared at her and leaned over the conference table toward her, making a hand gesture as though he was pulling the trigger on a gun many times. Dr. Barrett said no and that she had not practiced using a gun since her NRA course on May 14th. Officer Luzier asked her if she carries her gun, and she said no, adding that she did not think that that was even allowed in PAE's office.

156.   Officer Luzier asked Dr. Barrett how many times she had called the FCPD. She answered his question. He began to mock her for those calls and suggested that she was calling FCPD excessively.

157.   Dr. Barrett said that she had spoken to FCPD about four times over the past year.

158.    Officer Luzier asked for the names of the FCPD officers she had spoken to. Dr. Barrett was more than willing to share this information, as she had done with Ms. Wilborn. Officer Luzier gave Dr. Barrett a pad of paper and a pen. She began to write down the names of the FCPD officers, but Officer Luzier grabbed the pad of paper away from her before she could finish. Dr. Barrett told him that she had given copies of the business cards of the three FCPD officers with whom she had spoken to Ms. Wilborn.

159.    While speaking to Officer Hall and Officer Luzier, Dr. Barrett remained calm, did not exhibit any violent actions, never threatened herself or others, and never said that she wanted to hurt others. When asked by Officer Hall or Officer Luzier whether she intended to harm herself or others, Dr. Barrett said she did not.

160.    Officer Luzier and Ms. Wilborn left the room again. Officer Hall remained in the room.

161.    While outside the room, Officer Luzier continued his discussions with Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, Mr. Cobb, and Ms. Wilborn, PAE's legal team, and possibly others at PAE, about removing Dr. Barrett from the building and sending her for a mental evaluation, regardless of her answers to Officer Luzier's questions.

162.    Officer Luzier came back to the room, this time without Ms. Wilborn.

163.    Officer Luzier began to question Dr. Barrett about the men following her. She again explained these situations and that the men of these cultures do not follow Western norms and the rule of law. She made clear in her explanations to Officer Luzier and Officer Hall that the violence she described was how things were handled in the stalkers' countries, not that she would handle things in such a manner, and that the violent nature of these phenomena was her reason for being concerned about her own safety.

164.    Dr. Barrett answered Officer Luzier that she was dealing with the stalkers by using the rule of law in the U.S. and speaking to law enforcement, as she had done by previously speaking to FCPD, and as she was doing with Officer Luzier and Officer Hall. She explained that her past reports to FCPD had seemed to help keep the stalkers away from her home, so she hoped that reporting the stalking incidents at her office to the ACPD might help keep the stalkers away from her office as well.

165.    In her answers to Officer Luzier's questions, Dr. Barrett did not threaten others or indicate that she intended or planned to undertake any violent act towards herself or others.

166.    It appeared to Dr. Barrett that Officer Hall and Officer Luzier, who glowered at her during most of his interrogation of her, did not want to understand what she was explaining to him about the situation, in contrast to the FCPD officers, who provided additional information and background on the cultural aspects involved and these specific stalking behaviors.

167.    Officer Luzier did not indicate to Dr. Barrett that he or Officer Hall had contacted the FCPD, despite her providing the names and contact information for the police officers she had spoken to. If Officer Luzier or Officer Hall had contacted the FCPD before issuing the ECO, they could have learned about the issues that Dr. Barrett reported (the stalking and harassment of Americans who have worked in Afghanistan and Iraq), with which the FCPD was familiar, so that they could determine the credibility of Dr. Barrett's claims.

168.    Officer Luzier and Officer Hall also appeared to disregard the context of Dr. Barrett's situation – that she was reporting this stalking as an employee of a defense contractor who was involved in national security work and had worked extensively overseas, including in conflict-affected nations.

169.    Officer Luzier was hostile during his interrogation of Dr. Barrett. While she was talking, Officer Luzier stared at her and often rolled his eyes and made other gestures of disbelief.

170.    Officer Luzier abruptly stood and said that he was going to take Dr. Barrett to "talk to the DHS folks who know more about this 'surveillance thing' than I do." His tone was derisive.

171.    Dr. Barrett assumed that Officer Luzier was referring to the U.S. Department of Homeland Security. His derisive manner made her very nervous and uncomfortable, and she told him that there was no reason for her to be taken anywhere and she was not leaving the office. She was petrified and told him, "I'm not going anywhere."

172.    Appearing frustrated, Officer Luzier abruptly stated, "Then I'm making an ECO." Dr. Barrett did not know what that was, and Officer Luzier did not explain what it was.

173.    Dr. Barrett later learned that "ECO" meant Emergency Custody Order. She was never shown any "ECO" or given any summary of the ECO procedures or what her rights might be.

174.    Ms. Wilborn returned and then left the room again with Officer Luzier.

175.    While outside the room, Officer Luzier continued to discuss with Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, Mr. Cobb, and Ms. Wilborn and possibly others at PAE, including PAE's legal team, the plan of removing Dr. Barrett from the workplace and having her sent to a hospital for examination, regardless of how she had answered Officer Luzier.

176.    Dr. Barrett tried to engage Officer Hall, who remained in the room, but she remained silent.

177.    Officer Luzier returned and said, "You're coming with us. Do you need to get your things?"

178.    It is worth noting that on the morning of July 13, 2017, the officers were not hurriedly responding to an emergency call at PAE; did not show up to a scene of disturbance; and there were no exigent circumstances present.

179.    While speaking to Officer Hall and Officer Luzier, Dr. Barrett remained calm, did not exhibit any violent actions, never threatened herself or others, and never said that she wanted to hurt others. When asked by Officer Hall or Officer Luzier whether she intended to harm herself or others, Dr. Barrett said she did not.

180.    Dr. Barrett also followed the instructions of her employer. She described what happened to Mr. Lietzau (her direct supervisor); Mr. Lietzau directed her to Mr. Horner (PAE Security); afterwards, she spoke to Ms. Wilborn (PAE HR), who asked if she would meet with the police, which Dr. Barrett was more than willing to do.

181.    Moreover, it appeared to Dr. Barrett that Officer Luzier discounted what she was explaining to him while giving complete credence to whatever the PAE personnel were telling him.

182.    On information and belief, Mr. Zyzneuski, Ms. Singh, and Mr. Pidone were present at PAE's office when Officer Luzier and Officer Hall were there. Officer Luzier and Officer Hall, however, did not speak with them.

183.    Moreover, it was apparent to Dr. Barrett that the decision of Officer Hall and Officer Luzier to issue an "ECO" reflected planning and coordination with PAE personnel, including Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, and Ms. Wilborn and possibly others at PAE, including PAE's legal team (led by Mr. Cobb).

184.    Although she did not wish to, but recognizing she had no choice in the matter, Dr.
Barrett cooperated and left with the officers. Terrified and in a state of shock, she indicated that
she needed to use the restroom. Officer Hall escorted Dr. Barrett through PAE's lobby and main
reception area to the restroom and Dr. Barrett's desk, in full view of her coworkers.

185.    Dr. Barrett left behind her backpack and personal laptop, as she thought she would
be returning to the office. After Dr. Barrett was seized, Mr. Zyzneuski saw that Officer Luzier
searched Dr. Barrett's backpack, presumably for a gun. There was no gun or other instrument of
harm in the backpack.

186.    Officer Hall then escorted Dr. Barrett out of PAE's office and to a waiting police
SUV vehicle. Officer Hall put Dr. Barrett in the back seat and took Dr. Barrett's purse and
planner from her to put them in the back of the vehicle.

187.    Officer Hall then drove Dr. Barrett to the Emergency Room ("ER") at Virginia
Hospital Center ("VHC").

188.    After Dr. Barrett was seized, PAE's legal team coached Ms. Wilborn as she filled out
a police report.

189.    Neither officer saw the police report until well after Dr. Barrett was seized.  In her
sworn testimony in February 2019, Ms. Wilborn admitted that she did not fill out the report until
after Dr. Barrett was seized from the PAE office.

190.    Nothing in the Arlington police report indicated that Dr. Barrett was a threat to
herself or others.

191.    Therefore, the addition of the PAE / Ms. Wilborn police report, with its false and
highly inflammatory "kill statements" would cover the police and PAE regarding a lack of

probable cause, as the PAE legal team knew that there was not enough probable cause to seize Dr. Barrett, even under a warrantless seizure.

**Dr. Barrett Is Taken to the Hospital Against Her Will**

192.    After arriving at the hospital, Officer Hall gave Dr. Barrett her purse and planner, entered the ER with her, and took her into a room with a sliding glass door.

193.    The nurse in the room looked between Dr. Barrett and Officer Hall in disbelief, saying to Officer Hall, "She's not disheveled; normally they are more disheveled."

194.    Officer Hall engaged with someone on the hospital staff, saying that she "did not want to be stuck here all day" and asked if the staff could provide a replacement. Officer Hall and a male armed guard came and sat outside the room.

195.    After transferring custody of Dr. Barrett to a hospital security guard, Officer Hall left the VHC.

196.    The nurse and a technician took Dr. Barrett's vitals, blood, and urine. She was never told that she had any choice with respect to these tests and was not given the option to refuse them.

197.    An ER doctor, Dr. Peter Liu ("Dr. Liu"), came into the room and asked Dr. Barrett what had happened. She gave him a brief overview of the stalking incident, explaining that she had reported it to her employer and to the police.

198.    A nurse entered the room and asked Dr. Barrett about her situation. Dr. Barrett gave a brief explanation, and the nurse commented, "At least her story is the same."

199.    Dr. Barrett was treated with disrespect, derision and outright mockery by the ER staff members she encountered, especially Dr. Liu. It was humiliating and extremely stressful.

200.   Dr. Barrett was never told why she was at the ER. She also was not told that she had the right to an attorney.

201.   An armed guard was stationed outside the door of the room at all times. This guard also escorted her to the restroom.

202.   Early in the day, the armed guard came into the room and offered Dr. Barrett water. He told her, "Don't worry; you'll be out of here in a couple of hours."

203.   Dr. Barrett attempted to call Ms. Wilborn and Mr. Lietzau, but neither of them answered her calls or called her back.

204.   Dr. Barrett then called Mr. Pidone, who answered. Dr. Barrett told Mr. Pidone what had happened and asked him what to do. He said that the police cannot hold her without probable cause, and that there was nothing he could do personally to help Dr. Barrett at this point.

205.   Dr. Barrett was only given water at the ER, at her request, and was not given any food all day.

**Mr. Galway "Assesses" Dr. Barrett**

206.   Eventually, the "DHS guy" that Officer Luzier had referred to came in to speak to Dr. Barrett. This man was Brian Galway ("Mr. Galway"), who, Dr. Barrett later learned, performs mental health assessments for the Arlington County Department of Human Services. Mr. Galway is also a "life coach."

207.   Mr. Galway was designated by the Arlington County Community Services Board ("ACCSB") to examine Dr. Barrett. The ACCSB is a creation of the Arlington County Board and its members are appointed by the Arlington County Board. The ACCSB's Executive Director is the Chief of the Behavioral Healthcare Division ("BHCD") within the Arlington DHS.

208. At all times in this case, Mr. Galway acted on behalf of and as an agent of the ACCSB, BHCD, and Arlington DHS.

209. In evaluating Dr. Barrett, Mr. Galway spoke several times to Ms. Wilborn. As part of his examination of Dr. Barrett, Mr. Galway also telephoned Mr. Lietzau. During his telephone call with Mr. Lietzau, Mr. Galway said that he did not see much reason to keep her and was thinking of releasing her. Mr. Galway asked Mr. Lietzau if that concerned him. Mr. Lietzau said that it did not. Mr. Lietzau later told a number of PAE employees in Dr. Barrett's division that he was not told by PAE's legal team that Dr. Barrett would be seized and taken from the office, indicating his full complicity in the retaliation.

210. Mr. Galway told Dr. Barrett that he was going to ask her a few questions. She was calm, cooperated, and answered his questions.

211. Mr. Galway asked Dr. Barrett about her gun. Mr. Galway used the phrase, "gun you recently purchased," while looking at a sheet of notes in his hands. Dr. Barrett corrected him, stating that the gun was purchased more than 10 years previously and she had never used it. Mr. Galway asked Dr. Barrett about the location of the gun. Dr. Barrett told him that it was in a storage closet.

212. He also asked her questions about her marriage, family, afternoon plans, and future plans.

213. At one point, Mr. Galway asked Dr. Barrett what she was going to do after their interview. She said that she was going to go back to the office to work. Mr. Galway looked surprised, though Dr. Barrett did not know why.

214. Mr. Galway also mentioned a reference to "Muslim networks" that Dr. Barrett had made in an email to Mr. Horner about the stalking incidents. Dr. Barrett explained that the

40

behaviors she experienced were typical behaviors of extremist Muslim networks, especially toward women working in girls' education and/or law enforcement, rule of law, and national security. She said that he might have seen extremist Muslim networks referenced in recent news stories. Mr. Galway had no reaction.

215.   Around mid-afternoon on July 13th, Mr. Galway returned and began questioning Dr. Barrett again.

216.   During this second round of questioning, Mr. Galway focused heavily on Dr. Barrett's gun, referring to a page of notes he was holding. He stated that he saw that she had "just purchased it" and Dr. Barrett again said no, that she had had the gun since around 2006. She explained that it had been in storage in Los Angeles for some years, then was shipped to Virginia, and was then in storage in her home.  She told him that the gun had never been used.

217.   Mr. Galway asked Dr. Barrett if she would willingly give up her gun. Under tremendous pressure and fearful of what was happening, she said yes and said that he could have it.

218.   It appeared to Dr. Barrett that Mr. Galway had spoken to someone at PAE during his break in questioning her.

219.   Mr. Galway had in fact spoken to "HR", Ms. Wilborn, and possibly other PAE employees, including members of PAE's legal team (led by Mr. Cobb).

220.   Mr. Galway asked, "What if you had some time off?" Dr. Barrett replied, "Fine, wouldn't you want a couple of weeks off paid vacation away from here?"

221.   At one point, a man came into the room, shoved a clipboard into Dr. Barrett's face, and said, "Sign this admission form." Dr. Barrett refused and told him to take it away, stating that she was being held against her will.

222.   Another staff member came in and asked for Dr. Barrett's insurance card. Dr. Barrett asked why, since she was not there of her own will, and refused to pay for this. She refused to give her insurance card.

223.   Mr. Galway continued to ask Dr. Barrett about the location of her gun. He asked for details about the location of her home, including local landmarks. He drew a diagram on the back of a sheet of paper and left the room. Dr. Barrett was very nervous, because her dogs were in her house, and she did not know what Mr. Galway was going to do with or at her home location.

224.   At one point during this conversation, Dr. Barrett mentioned getting a lawyer, and Mr. Galway became surprised and angry.

225.   To Dr. Barrett, Mr. Galway was struggling to find a way to get her to confess to some wrongdoing. He offered that if Dr. Barrett were to give up her gun and enter an outpatient counseling program and see a counselor, she would be freed.

226.   At this point, Dr. Barrett had been under extreme, continuing interrogation and high stress for more than four hours. She agreed to the conditions if this would free her to return to work. Dr. Barrett still refused to acknowledge anything was wrong with her or that she had done any wrong. Mr. Galway left the room again.

227.   When Mr. Galway eventually returned to the room, he held up two pieces of paper. Dr. Barrett presumed that one contained his notes from their interrogation/interview and one contained notes from a conversation he had with the police officers and/or PAE. Mr. Galway said, "These do not match." It was clear to Dr. Barrett that Mr. Galway was unsure what to do next.

42

**Mr. Galway Speaks with Mr. Lietzau and Ms. Wilborn, and Possibly Other PAE Staff**

228.   Mr. Galway asked Dr. Barrett who she would most trust and whose opinion she would value among Ms. Singh, Mr. Zyzneuski, and Mr. Lietzau. Dr. Barrett said Mr. Lietzau, because she felt that he was the best one for Mr. Galway to speak to as he is the most senior, the most experienced, is a lawyer, and is personally familiar with this phenomenon of international stalking, having experienced it himself.

229.   Mr. Galway asked Dr. Barrett to describe Mr. Lietzau and she did so, speaking positively about his work.

230.   Mr. Galway left the room to call Mr. Lietzau. Mr. Lietzau should have told Mr. Galway the truth; that he did not believe that Dr. Barrett was capable of hurting others, and that Dr. Barrett's account of being stalked was credible given what he knows of the intimidation phenomena involved here and in other similar circumstances.

231.   Mr. Lietzau testified in February 2019 that he believed Dr. Barrett was unlikely to hurt anyone and that he had worked with Dr. Barrett for more than a year, beginning in May 2016, and that during that time, he spoke to or saw Dr. Barrett either daily or several times per week.

232.   While Mr. Lietzau was speaking to Mr. Galway, Mr. Zyznieuski entered Mr. Lietzau's office. Mr. Zyznieuski, who worked closely with Dr. Barrett and sat directly next to her in the office, said out loud that he had zero concern that Dr. Barrett would pose a threat to anyone at PAE.

233.   PAE's legal team, Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, and Ms. Wilborn, and possibly others at PAE, had at least three motives for keeping Dr. Barrett from returning to work, sending her to the hospital for a mental evaluation, and committing her to a

psychiatric facility. First, having her committed to a psychiatric facility would discredit her claims that PAE was providing misleading reports on the contract managed by Mr. Lietzau. Second, having Dr. Barrett committed to a psychiatric facility for having "paranoid delusions" about being stalked would absolve PAE from any liability for having failed to protect Dr. Barrett from that stalking and save PAE the cost and trouble of addressing the stalking. Third, it would save PAE from scrutiny over its lack of security, and possible resultant contract losses from losing its building security clearance.

234.    When Mr. Galway returned, he was hostile. He pointed to a chair in the far corner of the room and said, "Sit there!" Dr. Barrett refused and sat directly in front of him.

235.    Mr. Galway said that the person he spoke to at PAE (who he would not identify) claimed that Dr. Barrett had said that she wanted to bomb a foreign country. Dr. Barrett was stunned and told him that she never said any such thing.

236.    Until Mr. Galway spoke to Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, and Ms. Wilborn, and possibly others at PAE, all coached by PAE's legal team, Mr. Galway had been clearly struggling to come up with a "diagnosis," because Dr. Barrett had not given him cause to believe that she was dangerous or a threat. When Mr. Galway spoke to the unidentified PAE employee (most likely Ms. Wilborn, who served as PAE's "point person" throughout) – along with possibly other PAE employees and members of PAE's legal team, however, an agreement was formed that if Dr. Barrett was unwilling to voluntarily commit herself for psychiatric care, a new (false) claim would be made that she had stated that she wanted to bomb a foreign country, which Mr. Galway would use as a pretense to justify seeking and obtaining an order to commit her involuntarily to the psychiatric ward of the hospital.

237.   Had Dr. Barrett agreed to voluntarily sign herself into the psychiatric ward, Mr. Galway would not have to follow through on the agreement he had reached with PAE's legal team, Mr. Greene, Mr. Lietzau, Mr. Cobb, Ms. Eastridge, Mr. Horner, and Ms. Wilborn, and possibly others at PAE, to seek her involuntary commitment based on the pretense that she had stated that she wanted to "bomb a foreign country." Mr. Galway, thus, told Dr. Barrett that she could sign herself into the psychiatric ward. She said that she was not going to do that, as there was nothing wrong with her.

238.   Mr. Galway kept putting intense pressure on Dr. Barrett to commit herself voluntarily.

239.   Dr. Barrett refused to do so, resulting in Mr. Galway became increasingly frustrated.

240.   Mr. Galway said, "You're making it hard" and left the room.

241.   Dr. Barrett was scared. It seemed clear to her that she was going to be forced into the hospital against her will. She texted her friends, Elizabeth Dvorak-Little ("Ms. Dvorak-Little") and Zorana Ilic ("Ms. Ilic"), for help.

**Mr. Galway Ignored Information that Corroborated Dr. Barrett's Account Because of His Agreement with PAE**

242.   Ms. Dvorak-Little and Ms. Ilic arrived late afternoon and brought Dr. Barrett food, since she had not been able to eat all day.

243.   When Ms. Ilic arrived, she corroborated Dr. Barrett's account of the stalking to Dr. Liu. Ms. Ilic told Dr. Liu that Dr. Barrett had been stalked and was not making this up. She mentioned newspaper articles and that Dr. Barrett had filed several police reports.

244.   Ms. Illic also phoned Ms. Wilborn, but she did not respond until several days later.

245.   Dr. Liu contacted Mr. Galway to let him know what Ms. Ilic had told him about Dr. Barrett (Ms. Ilic's corroboration of Dr. Barrett's account of the stalking).

246.    Mr. Galway told Dr. Liu that he (Mr. Galway) would return to re-evaluate Dr. Barrett in light of this information and to speak with Ms. Ilic. However, Mr. Galway never came back to speak to Ms. Ilic or re-evaluate Dr. Barrett, because he had agreed with PAE to illegally detain Dr. Barrett the previous day.

**A "Temporary Detention Order" Commits Dr. Barrett to the Psychiatric Ward**

247.    The hospital record shows that five minutes before Mr. Galway ran to obtain the Petition for Involuntary Admission for Treatment that he spoke with "HR".

248.    Hospital and other records also show that Mr. Galway had the support of Alexis Mapes and her mental health team in obtaining the Temporary Detention Order.

249.    Alexis Mapes had spoken with Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, Ms. Wilborn and PAE's legal team (led by Mr. Cobb) on July 11, July 12, and July 13, in furtherance of PAE's plan to illegally seize Dr. Barrett.

250.    PAE needed Ms. Mapes' support to ensure Dr. Barrett would be detained and their plan would succeed.

251.    As per his agreement with Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, Ms. Wilborn and PAE's legal team (led by Mr. Cobb), on the afternoon of July 13, 2017, Mr. Galway signed a Petition for Involuntary Admission for Treatment to keep Dr. Barrett confined in VHC's psychiatric ward.

252.    Ms. Dvorak-Little had found Dr. Barrett an attorney, and they had to scramble to retain the attorney and complete paperwork before the court order to take Dr. Barrett into custody was served. As they were signing and faxing paperwork, a new set of police officers (a man and a woman) arrived outside the door. Ms. Dvorak-Little and Ms. Ilic delayed them while Dr. Barrett finished speaking with the lawyers to ensure that Dr. Barrett had legal representation.

46

253.    The male police officer then came into the room and served Dr. Barrett with a
Temporary Detention Order ("TDO") committing her to the Virginia Hospital Center's
psychiatric ward. He would not let her touch it but let her read it while he held it near her. The
order was signed at 5:15 p.m. that day (July 13th).

**Mr. Galway's False Representation to Obtain the TDO**

254.    At some point prior to 5:15 p.m. on July 13th, as agreed with PAE the day before, Mr.
Galway had filed a sworn petition requesting the General District Court to issue a TDO to
confine Dr. Barrett in the psychiatric ward. Mr. Galway filed the petition on behalf of himself
and the ACCSB, BHCD, and Arlington DHS.

255.    In his petition, Mr. Galway claimed that there existed a substantial likelihood that in
the near future, Dr. Barrett would cause serious physical injury both to herself and to others, and
that she would suffer serious harm due to what he claimed was her lack of capacity to protect
herself from harm or to provide for her own basic human needs. Notably, however, in his
petition, Mr. Galway did not check the preceding box to indicate that Dr. Barrett "has a mental
illness."

256.    In his petition, Mr. Galway represented to the General District Court that a
preadmission screening report had been prepared and was attached to the petition. The
representations Mr. Galway made to the General District Court were false.

257.    The General District Court, specifically, Magistrate Jason Brayton-Lewis, signed and
issued the TDO at 5:15 p.m. on July 13th. Mr. Galway, however, did not complete and sign the
preadmission screening report until 6:55 p.m., and the report was not finally approved until 7:07
p.m., nearly two hours after the General District Court issued the TDO. Contrary to Mr.

Galway's representation, it was not possible for his preadmission screening report to be attached to his petition for a TDO, as his petition stated it was.

258.    Because Mr. Galway's TDO petition could not have included the preadmission screening report (which separately reported his examination of Dr. Barrett) when he presented his TDO petition to the Magistrate, nothing on the face of the TDO petition, and no attachments to the TDO petition, indicated that Mr. Galway had examined Dr. Barrett, even though the TDO states that an evaluation had been done by Mr. Galway as a precondition for the issuance of the TDO.

259.    The TDO also indicated that it was issued "upon the sworn petition of Brian Galway" and that Mr. Galway had concluded in his TDO petition that Dr. Barrett suffered from a mental illness, when in fact Mr. Galway's TDO petition did not reflect any such conclusion.

**Dr. Barrett Spends a Terrifying Several Days in the Psychiatric Ward**

260.    After Dr. Barrett was served with the TDO, someone from the ER staff came in, handed Dr. Barrett a gown, and told her to get into it. She had to remove all of her clothes except her underwear. She was then instructed to get into a wheelchair. Her personal effects were taken away from her and she was only allowed to write down phone numbers on a piece of paper.

261.    Both police officers wheeled Dr. Barrett to the lockdown psychiatric ward and passed her along to a nurse.

262.    The nurse took Dr. Barrett's vitals. Her pulse was so high (120) that the nurse was afraid that the machine was broken and took Dr. Barrett's pulse manually to confirm. Dr. Barrett's temperature was also high. The nurse asked her to drink some ginger ale.

263.    Dr. Barrett was sent to a room in the psychiatric ward with a roommate.

264.     One of her attorneys arrived shortly thereafter. They discussed her case, and the law firm agreed to represent her.

265.     After the attorney left, a large (around 6'5" and 270 pound) male patient became verbally abusive and violent. Two hospital security officers were brought in to handle the situation. The room in which this happened was two doors down from Dr. Barrett's. Dr. Barrett's door was open, and her bed was nearest to the door. She was fearful should this man become violent again due to her proximity to his room.

266.     Dr. Barrett later learned that in the afternoon, while she was being held at VHC, that Mr. Lietzau had called a meeting of her coworkers at PAE and told them, "Kerrin has been taken in for questioning."

267.     Mr. Lietzau also told her co-workers that he was told she would "not be taken out of the building", indicating that he was aware of and fully involved in the PAE plot to discredit and defame her by subjecting her to a surprise "mental health evaluation" by Arlington police.

268.     Dr. Barrett learned later that her coworker, Dr. Melissa Stone ("Dr. Stone"), challenged Mr. Lietzau and Ms. Eastridge, asking them if they had ever been followed before, and relating her own experience in Albania that caused her to return to the U.S. Mr. Lietzau and Ms. Eastridge did not respond.

269.     Dr. Barrett was barely able to sleep all night, as she was very worried about the situation, particularly about if the police were going to break down her door to search for her gun and therefore let her dogs escape to the street outside.

270.     The next morning, a nurse came in at 6:00 a.m. to take more blood and vitals from Dr. Barrett. Dr. Barrett refused. Dr. Barrett then had to have breakfast with the other psychiatric

patients, all of whom were heavily medicated, with some babbling incoherently and some smelling of urine and feces.

271.    That morning, Dr. Barrett met with Dr. Peggy Lomax ("Dr. Lomax"), who was assigned to her in the psychiatric ward. Dr. Lomax asked Dr. Barrett basic questions, such as about her family (particularly about relationships with brothers and sisters). Dr. Barrett said that she did not know why she was in the psychiatric ward. Dr. Lomax did not give her any reason.

272.    Dr. Lomax strongly encouraged Dr. Barrett to get a "comprehensive blood test" done. Dr. Barrett politely declined, stating that she had her own doctor and yearly physical exams.

273.    The psychiatric ward staff kept trying to get Dr. Barrett to join in patient activities. Dr. Barrett politely declined.

274.    Ms. Dvorak-Little and Ms. Ilic visited Dr. Barrett that evening and brought her food, reading material, and pajamas. All of their effects were searched for contraband, to include caffeinated drinks. Dr. Barrett was only allowed one cup of coffee per day.

275.    Dr. Barrett met with Dr. Lomax again. Dr. Lomax indicated that she was supportive, asked if she had any questions, and gave her information for her commitment hearing on Monday. Dr. Lomax told her to be sure to emphasize at the hearing that she is not a threat to the community or herself.

276.    Dr. Barrett reiterated that she did not know why she had been sent to the psychiatric ward. Dr. Lomax again asked Dr. Barrett to submit to further blood work. Dr. Barrett again politely declined, noting that someone would be paying for those tests, but it would not be her.

277.    That evening, a nurse came into Dr. Barrett's room and asked her if she was depressed, heard voices, or anything of that sort. Dr. Barrett said no. The nurse responded, "What are you doing here?" Dr. Barrett's voice broke and she said, "I don't know."

50

278.    A nurse came to the room at night to conduct an in-room therapy activity on "Coping Skills."

279.    Dr. Barrett met with Dr. Lomax a final time on Sunday, July 16, and Dr. Barrett asked her questions about the hearing. Dr. Lomax said that Dr. Barrett needed to find out who did this to her. Dr. Barrett cautiously repeated what she believed had caused this (Mr. Lietzau, PAE Security, and PAE HR). Dr. Barrett said that it was ironic that her work at PAE involved reporting on gender statistics, including women and children in prisons due to male abuse, and yet in the U.S., she reported abuse to her male supervisor and had found herself arrested and locked up in a psychiatric ward.

280.    Dr. Lomax then discussed billing and payment for the hospitalization. Dr. Barrett reiterated that she was there against her will and would refuse to pay any and all bills and charges. Dr. Lomax said that it did not matter; VHC would find Dr. Barrett and her insurance, and if that occurred, once the County had already paid, she would, in addition, be liable for fees.

281.    Dr. Barrett asked Dr. Lomax if Ms. Dvorak-Little and Ms. Ilic could visit her before her hearing to help her get ready. Dr. Lomax wrote an order allowing them to come to the ward in the morning before the hearing.

282.    Ms. Dvorak-Little and Ms. Ilic visited Dr. Barrett that evening to bring some things to help her get ready for the hearing. The nurses gave her bags to use to pack her belongings from her room. The bag had to be kept at the nurses' desk.

283.    Dr. Barrett's stay in the psychiatric ward had been a very uncomfortable and frightening experience. Many of the other patients in the ward were homeless, severely mentally ill, and/or violent. Some of the other patients were very aggressive and agitated, including frequently screaming and yelling. Sometimes male patients would stand outside Dr. Barrett's

door and stare in. The door to Dr. Barrett's room did not lock, so she had to be worried about violent patients coming into her room.

284.    During the day, there was continuous screaming and shouting. Patients wandered about freely, some smelling strongly of feces.

285.    It was difficult for Dr. Barrett to communicate with the outside world, since the phones were taken out of service for several hours per day, and even when they were connected, they did not work well and frequently disconnected calls.

286.    Dr. Barrett could not get a full night's sleep during her incarceration at the psychiatric ward, since she was constantly checked on by nursing staff. Dr. Barrett also could not get simple hygiene and health items like eye drops and dental floss in the psychiatric ward.

287.    In addition, the majority of the patients in the psychiatric ward were not on TDOs, so it was clear that that type of involuntary detention was relatively rare, even among the severely mentally ill patients. Dr. Barrett observed a red dot next to her name on the patient white board, which only at most three other patients had as a designation, out of approximately twenty.

**Dr. Barrett Is Released After Her Case is Dismissed at the Commitment Hearing**

288.    The next day, July 17, 2017, was Dr. Barrett's commitment hearing, to determine whether she would be committed indefinitely to the psychiatric ward or released.

289.    Dr. Barrett met early to prepare for the hearing with her attorneys. She was interviewed by two county mental health assessors who worked for Arlington DHS for her pre-hearing assessments in the psychiatric ward.

290.    The assessors could have dismissed Dr. Barrett's matter without her needing to attend a hearing, but one of the assessors, who had spoken with PAE personnel on multiple calls, declined to stop the case from going forward to the hearing, saying that she wanted it "on the record."

291.    The other assessor who interviewed Dr. Barrett determined that there was no evidence of a mental disorder, that Dr. Barrett was not a threat, and that Dr. Barnett did not meet the statutory criteria for involuntary inpatient treatment. This assessor also told Dr. Barrett about PAE's calls to Arlington DHS on July 11th, as described above.

292.    When it was Dr. Barrett's turn for the hearing, a police officer escorted her to the hearing room in another part of the hospital, through a back stairwell. The hearing room was a makeshift conference room.

293.    The hearing was attended by a magistrate judge, the two mental health assessors, Dr. Barrett, her attorneys, a public defender, Mr. Zyzneuski, Ms. Ilic, Ms. Dvorak-Little, and Mr. Lietzau, representing PAE as General Counsel (although PAE has other General Counsels who could have attended the hearing instead).

294.    Mr. Lietzau avoided eye contact with Dr. Barrett and did not communicate with her.

295.    At the hearing, everyone present except Mr. Zyzneuski spoke. None of them were in favor of admitting Dr. Barrett to the psychiatric ward.

296.    The judge read the witness statements provided by Dr. Barrett's counsel by FCPD officers and Mr. Pidone. He asked Ms. Dvorak-Little, who has a background in national security and worked in Afghanistan, if she were Dr. Barrett, would she be concerned for her safety. Ms. Dvorak-Little replied, "Absolutely."

297.    The judge asked the Public Defender about Dr. Barrett's gun, and she stated that Dr. Barrett "answered the question of owning a gun honestly." The judge cautioned Dr. Barrett that she should invest in a gun safe, for her own safety.

298.    The judge asked the DHS Assessor who had briefly interviewed Dr. Barrett if she found any sign of mental illness. The assessor replied that Dr. Barrett was not mentally ill or a danger to herself or others.

299.    The judge asked Mr. Lietzau about his interactions with Dr. Barrett. He asked Mr. Lietzau how often he saw Dr. Barrett, and Mr. Lietzau replied that he saw her every day. The judge asked Mr. Lietzau if he had ever seen Dr. Barrett behave violently or make violent statements, and Mr. Lietzau said no.

300.    At the end of the hearing, the magistrate judge dismissed Dr. Barrett's case and told Mr. Lietzau to "provide for her [Dr. Barrett's] security."

301.    The magistrate judge also brought up the point that, if Dr. Barrett had actually been planning some sort of violent action against herself and/or others, it would not make sense for her to have gone to her supervisor to report the stalking, followed his suggestion to speak to security, willingly spoken to HR, and willingly spoken to the ACPD.

302.    The magistrate judge commented that the Virginia mental health system, in particular the process of involuntarily committing people to psychiatric hospitalization, is "broken and in serious need of significant reform," as evidenced by Dr. Barrett's case.

303.    Despite Dr. Barrett's case just being dismissed and no finding of mental illness, Mr. Lietzau stated that in order for Dr. Barrett to return to work, she would need "a doctor's note", further evidence of PAE's egregious attempt to permanently discredit Dr. Barrett as a result of her efforts to address PAE's fraudulent reporting on CSSP.

304.    The police officer led Dr. Barrett back outside of the psychiatric ward to collect her belongings, and then she was allowed to leave.

305.    On July 17, 2017, Mr. Zyzneuski went to PAE's parking garage to retrieve Dr. Barrett's car. He tried to use her PAE badge to exit the parking garage, but discovered that her badge had been deactivated. He had to use another employee's badge to get her car out.

**Dr. Barrett's Staff is Retaliated against because of their Lawful Acts to Stop FCA Violations**

306.    The week immediately following the dismissal of Dr. Barrett's commitment case, Dr. Barrett's M&E Team lead in Kabul (Mr. Wardak) contacted her via Skype. He was very frightened and upset; the CoT had threatened him with termination and revocation of his Special Immigrant Visa application over alleged disrespectful behavior toward a female staff member.

307.    Mr. Yama, the father of five girls, had an exemplary record of service to PAE over the previous three years, and Dr. Barrett never experienced any negative behavior over the seventeen and a half months she supervised him. He was also responsible for hiring the first women to the M&E team in Kabul.

308.    This clear act of retaliation by PAE against her senior-most staff member in the field so soon after Dr. Barrett was illegally seized was meant to ensure that Dr. Barrett's Kabul-based staff also would be made aware of the consequences of continuing with their data verification plans to address the fraudulent reporting.

309.    In September 2017, Nick Zyznieuski and Jessica Singh, fearing retaliation and for their own careers, resigned from PAE.

310.    All planned M&E data verification and other improvements to the system of measurements were never implemented, although they were an integral part of PAE's technical proposal for the new contract award. This included, in particular, the monitoring of the nine prisons that had never before been monitored.

**Dr. Barrett is Wrongfully Terminated because of her Lawful Acts to Stop FCA Violations on CSSP**

311.    As a result of Dr. Barrett's diligence in ¶21-41, ¶52-69, ¶73-75, ¶79-81, and ¶84-100, Department of State officials and PAE executives became aware of PAE's fraudulent reporting practices.

312.    As a result of Dr. Barrett's diligence in ¶21-41, ¶52-69, ¶73-75, ¶79-81, and ¶84-100, Department of State officials and PAE executives were notified of PAE's corrupt and noncompliant data gathering procedures.

313.    As a result of Dr. Barrett's diligence in ¶21-41, ¶52-69, ¶73-75, ¶79-81, and ¶84-100, Department of State officials and PAE executives became aware of PAE's lack of oversight in relation to construction projects, the Industries program, and prison donations in violation of its contractual duties to DOS.

314.    Dr. Barrett regularly provided PAE's management with notice that data was being over-reported on CSSP, in fact, many times the actual numbers. Dr. Barrett's Personal Goal Statements provided to PAE reflect her high expectations for compliance, professionalism, and the standards of her team.

315.    In shock and emotionally distraught after her illegal seizure from PAE's offices, Dr. Barrett went on annual leave on July 17, 2017.  When her paid leave finished, on or about the end of July 2017, Dr. Barrett went on unpaid leave.

316.    Dr. Barrett remained on unpaid leave until her wrongful termination in January 2018.

317.    PAE further harmed Dr. Barrett by never contacting her once over the course of the six months following her illegal seizure from PAE's offices to determine her wellbeing or her willingness to return to work.

318.   What is clear from the Human Resources Department's complete lack of action is that PAE had no desire whatsoever to provide Dr. Barrett with a meaningful, fair, or accurate redress of her concerns.

319.   PAE used as its reason to terminate Dr. Barrett her lack of a security clearance, which was a requirement for the position.

320.   Yet PAE knew full well that by having Dr. Barrett committed to a psychiatric facility on an Emergency Commitment Order as a "dangerous" individual, despite no evidence, that she would never be able to hold a security clearance again.

321.   The extensive and intensive participation of PAE's legal team throughout the entire period of July 2017 until January 2018 is evidence of the magnitude PAE placed on the threat of Dr. Barrett's revealing of significant fraudulent reporting covered under the False Claims Act.

322.   On January 15, 2018, PAE sent Dr. Barrett a letter saying that PAE was ending her employment effective January 31, 2018.

323.   On January 31, 2018, PAE terminated Dr. Barrett's employment for the pretextual reason that she had failed to obtain a security clearance, when in fact they had lost her application two times previously, significantly delaying her clearance, then having her illegally seized on a sham "mental evaluation" as a "dangerous" person, guaranteeing she would never hold a clearance again.

324.   Dr. Barrett's termination was the result of her reporting PAE's numerous violations and the extreme over-inflating of programmatic data that made it appear that the CSSP program was far more effective than it was in reality.

325.   Dr. Barrett has the TDO and ECO on her permanent record. The TDO and ECO cannot be expunged from her record. These records mean that she will not be able to obtain

another security clearance or work in education, or other sensitive positions. The lack of a security clearance in particular severely limits Dr. Barrett's ability to continue working in her field.

326.    With an ECO and TDO on her record, Dr. Barrett's travel becomes restricted.

327.    Dr. Barrett is now ostensibly responsible for tens of thousands of dollars in doctor and hospital bills. Her medical record and insurance profile are now adversely impacted for the remainder of her life.

## CLAIMS

### COUNT ONE
### False Claims Act Retaliation, 31 U.S.C. § 3730(h)
### Against Defendant PAE

328.    Dr. Barrett realleges and incorporates the allegations set forth in paragraphs 1 through 327 as though fully alleged herein.

329.    PAE knowingly presented or caused to be presented to the United States, false or fraudulent claims for payment or approval, more specifically PAE submitted false claims for payment to the government related its contracts with the Department of State, INL.

330.    The United States, unaware of the falsity of the claim and statements made by PAE and in reliance on the accuracy of PAE's claims, paid PAE, which was a false claim of public funds.

331.    PAE knowingly made, used, or caused to be made or use, a false record or statement material to a false or fraudulent claim.

332.    PAE knowingly failed to disclose material facts to obtain payment or approval pursuant to its contracts with the United States government in violation of 31 U.S.C. §3729(a)(l)(A).

333.    Defendants conspired to commit violations of 31 U.S.C. § 3729(A), (B), (D), and (G).

334.    Dr. Barrett believed in good faith that PAE's misappropriation of the government funds was in violation of the FCA and took lawful action in furtherance of a FCA action by investigating and raising concerns to PAE and DOS personnel that she believed there was a deliberate attempt to defraud the federal government by the behavior described in ¶21-41, ¶52-69, ¶73-75, ¶79-81, and ¶84-100.

335.    A reasonable employee in the same or similar circumstances as Dr. Barrett might believe that PAE was committing fraud against the government.

336.    Defendants had a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a FCA action.

337.    After Dr. Barrett engaged in protected conduct, Mr. Greene, Mr. Lietzau, Ms. Eastridge, Mr. Horner, Ms. Wilborn, and possibly others at PAE, developed a plan, coached by the PAE legal team (led by Mr. Cobb), to retaliate against Dr. Barrett by subjecting her for a sham "mental evaluation", and when she did not quit the company of her own volition, targeted her for termination.

338.    Defendants terminated Dr. Barrett because of her lawful acts to stop PAE from violating the FCA, as described in ¶21-41, ¶52-69, ¶73-75, ¶79-81, and ¶84-100.

339.    Defendant would not have taken these retaliatory actions against Dr. Barrett if it were not for her disclosure of the violations mentioned in ¶21-41, ¶52-69, ¶73-75, ¶79-81, and ¶84-100.

340.    Dr. Barrett has suffered and continues to suffer damages as a result of Defendants' retaliation.

## COUNT TWO
## 31 U.S.C. § 3730(h)
## (Discrimination and Harassment Against Plaintiff by PAE)

341.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

342.    Defendant PAE took no corrective action with regard to Mr. Greene's, Mr. Lietzau's, and Ms. Eastridge's misconduct during the time in which Dr. Barrett attempted to work through proper channels within PAE to resolve the retaliatory actions against her. Those retaliatory actions included ongoing discrimination and harassment through PAE management's dismissive actions, PAE conspiring with Arlington police to have her illegally seized from PAE's offices that led to Dr. Barrett's termination, terminating her, and providing derogatory information about her to the staff in division in which she worked, as well as to the INL CSSP Program Officer and others in the Department of State.

343.    Defendants have illegally threatened, harassed, and discriminated against Dr. Barrett in the terms and conditions of her employment because of lawful acts done by Dr. Barrett in furtherance of an action under the False Claims Act, including investigation of, and initiation of, an action filed under the False Claims Act.

344.    This harassment and discrimination resulted in Dr. Barrett's illegal and improper termination from PAE and a corresponding loss of income.

345.    This harassment and discrimination also resulted in a dramatic loss of income as a result of the permanent damage done to Dr. Barrett's personal and professional reputation stemming from her illegal seizure by Arlington County police officers as a result of a conspiracy between said officers and county mental health workers, and PAE's management, human resources and legal teams.

346.    This harassment, in particular the unlawful seizure and involuntary commitment to a mental facility, has seriously undermined Dr. Barrett's credibility, personal and professional integrity, and has resulted in significant financial loss and distress for Dr. Barrett.

347.    This ongoing discrimination and harassment led to Dr. Barrett's wrongful termination on January 31, 2018, exacerbating the significant financial loss she already experienced by being forced to take unpaid leave for six months, and intensifying the distress she already experienced as a result of the ongoing harassment, and terrifying and humiliating commitment ordeal.

348.    These actions have significantly affected her ability to pursue her professional career causing irreparable reputational damage and significantly limiting her chances to obtain work in her field and continue to pursue her career as an evaluator and educator.

## COUNT THREE
## 31 U.S.C.  § 3730(h)
## (Interference with Economic Relationships and Activity by PAE)

349.    Plaintiff incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

350.    In addition to Dr. Barrett's voiced concerns about PAE's fraudulent reporting practices, having Dr. Barrett removed from PAE's workplace by a police officer, sent to the hospital for a mental evaluation, and committed to a psychiatric facility served the interests of PAE, as such actions would tend to discredit Dr. Barrett's allegations that PAE had failed to provide sufficient security for employees against the sort of stalking that Dr. Barrett was experiencing, and that PAE had failed to secure its facilities against the workplace intrusions that Dr. Barrett was reporting. Such concerns by Dr. Barrett, if not discredited, would have embarrassed and harmed the reputation of PAE, an international security firm, and/or

jeopardized its government contracts, which require a high level of security for contractor facilities and personnel.

351.    Furthermore, taking Dr. Barrett to a psychiatric hospital would – and did – lead to the elimination of any possibility of obtaining a security clearance (a requirement for her position), her termination from PAE, and the elimination of any need to address the security concerns (and fraudulent contract reporting) that Dr. Barrett had been raising as an employee of PAE.

352.    PAE engaged in the acts described above intentionally and willfully for the specific purpose of causing damage to Dr. Barrett, loss in her lawful profession as a PhD evaluator, her desire to continue teaching in academia, and her economic right to, among other things, engage in her chosen profession without interference or damage to her personal and professional reputation.

353.    PAE engaged in the conduct described herein for the unlawful purpose of causing Dr. Barrett damage and loss without any justifiable cause for the actions or right to perform such actions. Furthermore, this conduct not only violated Virginia and Federal law, PAE's conduct also violated its own processes and procedures.

354.    The acts of described herein caused actual damage to Dr. Barrett, including significant loss of income generated from her profession as a PhD evaluator, as well as permanent and irreversible damage to her professional reputation.

355.    If PAE had not committed the conduct described in this action, Dr. Barrett would not have suffered actual damages and loss. Moreover, her actual damages and loss were directly and proximately caused by PAE's conduct, or by the conduct of its agents, representatives, and employees, and there was no negligence or wrongful acts on the part of Dr. Barrett contributing thereto.

356. Furthermore, PAE's actions were done with actual malice and with the knowing intent to harm Dr. Barrett and to destroy her reputation, both personally and professionally.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Barrett, on behalf of herself individually, demands all damages available to her under 31 U.S.C. § 3730(h) and Virginia law including, but not limited to:

a) Compensatory damages in an amount to be established at trial, including double back pay and interest;

b) An award of punitive damages;

c) An award to Dr. Barrett of sufficient sums to compensate her for economic losses as well as for past, present, and future pain and suffering, inconvenience, reduction in quality of life, and lost wages;

d) Costs and attorney's fees as recoverable by law;

e) Such other and further relief that this Honorable Court deems just and proper to award.

**Pursuant to Fed. R. Civ. P. 38, Plaintiff demands trial by jury.**

## Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: ___1/28/2021___

___[signature]___

Kerrin A. Barrett, PhD, Plaintiff *Pro Se*
5753 Highway 85 North, #2926
Crestview, FL 32536
Ph: (850) 331-8916
Court.KB2021@protonmail.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRIGINIA
Alexandria_____ **DIVISION**


Kerrin A Barrett
_____
                    Plaintiff(s),


                 v.

                                                    Civil Action Number: _____

PAE Incorporated
_____
                    Defendant(s).


## LOCAL RULE 83.1(M) CERTIFICATION


**I declare under penalty of perjury that:**

**No attorney has prepared, or assisted in the preparation of**_____          Complaint          .
                                                                                          **(Title of Document)**

Kerrin A Barrett
_____
Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _1/28/2021_____ (Date)

                                    **OR**


**The following attorney(s) prepared or assisted me in preparation of** _____.
                                                                                          **(Title of Document)**

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____ (Date)